We'll hear argument first this morning in Case 13-1371, the Texas Department of Housing and Community Affairs v. the Inclusive Communities Project. Mr. Keller? Thank you, Mr. Chief Justice, and may it please the Court. The Fair Housing Act does not recognize disparate impact claims, first, because its plain text doesn't use effects or results-based language. And when a statute prohibits actions taken because of race, and it lacks effects-based language, the statute is limited to intentional discrimination. And second, the canon of constitutional avoidance compels this interpretation. Most importantly, the Act doesn't use the phrase, adversely affect. Smith v. City of Jackson recognized that this effects-based phrase was At the time of Smith and Gregg, neither the Title VII or the ADEA used the words disparate impact, and yet we recognize they apply. Disparate impact. At the time, disparate impact – the words disparate impact were not used. However, the words adversely affect were used. And Watson subsequently interpreted Gregg's as finding the textual hook for disparate impact liability was based on the phrase adversely affect. Well, you have a problem because it says to refuse to sell or rent, et cetera, or otherwise make unavailable. And the agency charged with interpreting that language has determined that it means disparate impact. Justice Sotomayor, the phrase make unavailable is an act prohibited by the Fair Housing Act. It is an act that prohibits that. It's a consequence. It happens to be because that's what you do with housing, but it's a consequence. The act of making unavailable a dwelling to a person is the act prohibited by the Fair Housing Act. This isn't like section 482 of the ADEA, where Smith said disparate impact lied. This is like section 481 of the ADEA, because the 804A prohibits the refusal to sell or rent, the refusal to negotiate, otherwise making unavailable or denying. All of those are active verbs, and they're all acts prohibited. The work that is being done by otherwise make unavailable is to cover additional acts, such as zoning decisions or land use restrictions, that are not outright refusals or outright denials. And that's why the language of the Fair Housing Act focuses on actions, not on acts. Scalia. But you could say the same thing about adversely affect. I mean, that also is an active verb, right? And it also, you had to adversely affect by discriminating. You know, the points you make are true enough, but they were also true with respect to Title VII, weren't they? Justice Scalia, I don't believe so, because section 482 and section 703A2 ban the act of limiting, segregating, and classifying. And then they checked for a certain result, something which would deprive, tend to deprive, or adversely affect. And it was that results or effects checking language that gave rise to disparate impact liability. Ginsburg. But after that language is the phrase, on the basis of race, sex, whatever. So it's adversely affect on the basis of the prohibiting category. Well, and that was the interpretation that the Smith plurality and concurrence came to on section 482. But in section 481, the phrase because of race appears, and you have active verbs there. You have refuse and otherwise discriminate. And the Court was unanimous in finding that section 481 only required intentional discrimination, did not give. Ginsburg. Do we take into account at all that in both Title VII and the Fair Housing Act, there was a grand goal that Congress had in mind? It meant to undo generations of rank discrimination. And what was the phrase that this Court used in Traffick County to describe the Fair Housing Act? That its objective was to replace ghettos by integrating integrated living patterns. Justice Title VII was meant to undo a legacy of rank employment discrimination. So doesn't that purpose give a clue to what Congress was after? Well, Justice Ginsburg, the Court needs to focus on the plain text. And unlike Title VII, which was passed in 1964, and unlike the ADEA, which was passed in 1967, both of which included the phrase, adversely affect, in 1968, when Congress passed the Fair Housing Act, it didn't use that language. Instead, it prohibited making unavailable a dwelling to any person because of race. In common language, if you were to say, Adam made unavailable a dwelling to Bob because of race, you ask, well, why did Adam act? He acted because of race, and race was a reason for the action. But if I could understand your point, General Keller, you agree with Justice Kagan that both verbs, make unavailable, is just one way to adversely affect. And what you are pinning your argument on is these extra added words in the Title VII statute, right, so that it's in the Title VII statute, it's the ---- I can't even find them. You know what I mean. I do, Justice Kagan. Kagan. So, but I don't think that that could possibly be right, because then you would be saying that it would be a different statute if instead of just saying here, an employer can't make unavailable, but instead it said an employer can't act in a way that makes unavailable, that would make it completely parallel to the Title VII and the ADEA statutes. And those two things just can't mean the same thing. I mean, all it's doing is to take out a few words, but it's saying the exact same thing, which is either way an employer can't make unavailable. Justice Kagan, I don't think it's saying the same thing, and under the reasoning of Smith it can't be saying the same thing, because Section 4A.1, the Court unanimously recognized, didn't give rise to disparate impact liability, and it didn't have the phrase that appeared in 4A.2, which was checking to see in any way which would deprive or tend to deprive or adversely affect. Without that results-based language, you can't have disparate impact liability. That's what Ricci said, second of all. But the thing that's different in this statute is the make unavailable, which focuses on an effect in the same way that the adversely affect language does. And it just does it a little bit more economically, but the effects-based nature of the provision is still the same. It doesn't focus on the effect. What Smith said was 4A.2 prohibited the act of limiting, segregating, and classifying. What Smith said, that's not simply what it was prohibiting. It was checking to see if there was also a deprivation or something that tended to deprive or something that adversely affected. And that was the effects-based language. It wasn't merely dropping in a phrase such as make unavailable. All actions have consequences, but here Congress chose active verbs. But as Meyer v. Holley recognized, the Fair Housing Act itself focuses on prohibited acts. Scalia, make unavailable is not the same language as adversely affect. That's all that I'm willing to concede. And I think if you thought that Smith was wrong, which many people do, I suppose you could argue we will not expand Smith. And Smith hung on particular words, adversely affect. Those words don't exist here, and therefore, since we think Smith was wrong anyway, we're not going to extend it. That's a reasonable argument, but that's not the argument you're making. What hangs me up is not so much that as it is the fact that Congress seemingly acknowledged the effects test in later legislation when it said that certain effects will not qualify. You know what I'm referring to? Yes, Justice Scalia. Well, why doesn't that kill your case? I mean, when we look at a provision of law, we look at the entire provision of law, including later amendments. We try to make sense of the law as a whole. Now, you see this statute, which has otherwise what is make unavailable, and it also has, however, it will not be a violation if these effects are or you read those together and you say, wow, this law must mean mere effects qualify. Justice Scalia, the 1988 amendments in enacting three exemptions from liability, those provisions merely restricted liability, and the Court rejected a virtually identical argument to what the Respondent and the Solicitor General are making in Ogilvie v. United States. It's a case that appears at 519 U.S. 79. Is this in your brief? The case is not cited in our brief. Oh, I'm sorry. At page 89 of that decision, the Court noted that Congress might simply have wanted to clarify the matter in respect to the narrow exemption, but it wanted to leave the law where it found it in respect to the broader issue. But the law where it found it here was very clear because 10 circuits had gone the other way and had said that disparate impact was a valid action under the FHA. So leaving the law where you found it, and we presume that Congress knows the law, especially when the law is that clear and that uniform, means, yes, there will be disparate impact actions, except in these three circumstances, which we're going to lay out for you very clearly and very precisely. Justice Kagan, in 1988, the state of the law was in flux. The Solicitor General filed a brief in this Court saying that the Fair Housing Act only prohibited acts of intentional discrimination. Two months before the amendments, this Court decided in Watson and emphasized that the phrase ''adversely affect'' was the language that gave rise to disparate impact liability. And if Congress would have taken – if Congress was assumed to have known that this Court's precedents were in place, then— Sotomayor, how do you put ''adversely affect''? Did they have to write it? Or otherwise adversely affect someone by making the housing unavailable? Otherwise. I mean, it's a little crazy, don't you think, because otherwise adversely affecting someone by making it unavailable? I think it's otherwise make unavailable. It's a shortened form of that. Otherwise limit housing opportunities in a way that would adversely affect. Congress could have used the same language that appeared in Title VII. But instead what it did, it took a body of law, some of which had held some practices as disparately, improperly disparately impacting, like drug addiction and others, and two others, and said, no, those two won't count, those three won't count. Your reading of those three exemptions is they were unnecessary. Well, they were absolutely doing work in 1988, and Congress could take account of the fact that— Well, what do you make with 1988 where someone wanted to do away with disparate impact and Congress didn't take up that invitation? Justice Sotomayor, I believe you're referring to Representative Swindoll's amendment. And the mere fact that Congress didn't enact a provision, this Court has not looked to in ensuring that you didn't. You're telling us that these amendments, which said that certain types of effect will not qualify, that the purpose of that amendment was to prevent erroneous Court of Appeals decisions from affecting those particular areas? Justice Scalia, that's part of the work. It's a very strange thing for Congress to do, to believe that those Court of Opinions —Court of Appeals opinions are wrong, and yet to enact these exemptions. So even though those opinions are wrong, they will not apply to these things. That's very strange. Well, in 1988, when Congress was legislating, it agreed on one thing, and that was in these three narrow circumstances, liability would be restricted under the Fair Housing Act. It would be extremely odd to read into a restriction of liability a recognition of a massive expansion of Fair Housing Act liability, and Congress does not hide elephants in mouse holes. Exactly. And Ten Circuits had already said there was disparate impact. If they didn't like the disparate impact analysis, they would have taken up the Congressman's proposal. But they didn't. In the brief that the Solicitor General filed in 1988, it made the point, which is absolutely the same today, which is Congress knows how to enact an effect. It changed when — no, no. When 1988 happened, the Solicitor General changed its position, and it has been consistent since then, that when Congress adopted the three exemptions, it recognized disparate impact as applying to the Fair Housing Act. That intentional brief was not in 1988, and not in — it was after — that was before 1988, the 1988 amendments. It was before the 1988 amendments, that's right. But this Court was considering the issue in town of Huntington. And after the amend — so while Congress is passing the 1988 amendments, this Court has a case where the issue is raised, and it was actively considering it.  Alitoso, I thought your argument on the 1988 amendments was as follows. Either the Fair Housing Act contemplated disparate impact analysis when it was adopted in — when was it, 1968, or it didn't. And the 1988 amendments, which made it clear that there could not be disparate impact analysis with respect to certain matters, surely didn't expand the scope of the — of what was initially enacted. So the issue is what did Congress intend, what is the meaning of the act as originally enacted? I thought that was your argument. Precisely, Justice Alito. The 1968 Act was — Ginsburg. But if we're going to be realistic about this, in 1964 when the Civil Rights Act passed and in 1968 when the Fair Housing Act passed, nobody knew anything about disparate impact. That didn't come up until the Griggs decision, and it was this Court that gave that interpretation to Title VII in light of the purpose of the statute. So to try to look back and say, oh, did they mean disparate impact in 64 when Griggs wasn't on the books until 71, it's a little artificial, don't you think? Well, the Court has to construe the plain text of the statute that Congress enacted. And the text in 1964 did not use effects — sorry. It has to construe the plain text of the law, and the law consists not just of what Congress did in 1968, but also what it did in 88. And you look at the whole law and you say, what makes sense? And if you read those two provisions together, it seems to be an acknowledgment that there is such a thing as disparate impact. However, it will not apply in these areas that the 1988 amendment says. We don't just look at each little piece when it was serially enacted and say, what did Congress think in 68, what did it think in 72? We look at the law, and the law includes the 68 Act and the 88 amendments. And I find it hard to read those two together in any other way than that there is such a thing as disparate impact. The 1988 amendments don't refer to disparate impact. This is not like the Title VII 1991 amendment that explicitly used the words disparate impact. But there is no sense unless there is such a thing as disparate impact. It's they are prohibiting something that doesn't exist, right? You're saying that they prohibit something that doesn't exist. They could do more work. They do work in district treatment cases. Take the occupancy exemption. The Fair Housing Act also prohibits the failure to make accommodations based on disability. The occupancy exemption is going to do work in that case. And this is why in City of Edmonds, the Court noted that these exemptions were complete exemptions from FHA scrutiny. Congress didn't say that it was limiting these to disparate impact. It said we don't want these claims to go forward. Breyer, I'll say you have an argument, and so does the other side have an argument. But I don't want you not to have the chance to answer what to me is a pretty important question. Say there are good arguments on both sides. The law has been against you. There's been disparate impact for 40 years. Now, let me be fair. Maybe it's only 35. And it's universally against you. And as far as I can tell, the world hasn't come to an end. I mean, the form of the question I'm putting is, well, maybe Marbury v. Madison was wrong. I don't think it was. But nonetheless, nonetheless, this has been the law of the United States uniformly throughout the United States for 35 years. It is important. And all the horribles that are painted don't seem to have happened, or at least we have survived them. So why should this Court suddenly come in and reverse an important law which seems to have worked out in a way that is helpful to many people, has not produced disaster, on the basis of going back and making a finely spun argument on the basis of a text that was passed many years ago, and is ambiguous at best? If you were to believe the statute's ambiguous? Oh, well, I don't think I'd mind. And, oh, my goodness, if it isn't ambiguous, it would be surprising, because 10 circuit courts of appeals have all interpreted it the way opposite you, and I take it you don't mean it's unambiguous on their side. In 1988, the amendments didn't touch the text of the 1968 Fair Housing Act. No, no, I don't want you to. If you'll do me the favor of answering my question. Sure. Which is the question that it's been the law for 40 years or just a little bit less. Disaster has not occurred, and why, when something is so well established throughout the United States, should this Court come in and change it? There's a serious equal protection question lurking here. And as to why you would change it, disparate impact liability and where it leads is being applied in a case like this in Magner v. Gallagher. Texas here was trying to give additional power to Texas. You don't like the way it was applied, and I can understand that. But there are many remedies that you have. One is you go to HUD and you say, look at what is happening. This is happening to have the opposite effect that you want. That's one of your arguments. Well, try to convince them. And if they're not there, you go to a court and say, court, this is a disparate impact case and we have a justification, and the justification is strong enough that it survives the empirical effect. And you see if you can get them to agree. You may win, you may lose. But what not to do is to overturn the whole law that has been in effect, I'll repeat for the 19th time, for 40 years with basically helpful effect. Now, that's a question. It didn't sound like one, but it was one. So I'd like to hear what you say. Sure. The equal protection concerns here are stark. First, the government has not explained if it's going to enforce the HUD regulation to protect only minorities. If it does, that's likely unconstitutional under Adirondack. And if it doesn't, that's going to interfere with Federal and State programs that help lower-income neighborhoods. How? So maybe I'm missing something here. Didn't this Court decide Marbury v. Madison? Absolutely, Justice Scalia. My question is not about that. Isn't that a big difference, I mean, between the situation here? This Court has never decided this issue. It's just that lower courts have decided it in a uniform fashion. Have we ever before reversed uniform holdings of courts of appeals? Even those that have lasted 30 years? The answer is yes. You have rejected the overwhelming consensus of the courts of appeals. Yeah, that's why I asked the question. Why? Why? I'm not saying you couldn't do it. I'm simply saying why. And I don't want to repeat my question for the fourth time. And you began to give an answer. And the answer you began to give was based on a constitutional problem that has arisen, and I've taken that in and read it. And do you have other answers or not? I want you fully to answer the question. Sure. The plain text of the statute is clear. Constitutional avoidance compels that interpretation. And the purposes of the Fair Housing Act would be undermined by extending disparate impact liability to this degree. Well, you're now talking about application. And let's go back to you made a statement earlier that this is going to inhibit development of blighted areas. That has to do with the application in this case. If I'm right about the theory of disparate impact, and I can tell you I've studied it very carefully, its intent is to ensure that anyone who is renting or selling property or making it unavailable is doing so not on the basis of the fact that it's not the basis of artificial, arbitrary, or unnecessary hurdles, policies or practices, and it's the Petitioner who has to identify which they are, and to explain why alternatives wouldn't work. If someone's developing a blighted area or an area subject to crime or something else, that's something they can do, and that's a criteria, a policy that can't be substituted for something else. So I don't know why you keep saying this is going to affect private development. Justice Sotomayor, in Ricci, the Court reserved the question whether disparate impact liability in requiring race-based decision-making would violate the Ecoprotection Clause. But this is not race-based decision-making. Are you saying that the 10 percent plan in colleges is race-based? It's an absolutely neutral policy that happens to address a need, which is to integrate schools. So why is it wrong to have a neutral policy? Because none of the policies that were imposed here and in most of all other cases are race-based. There are policies that are race-neutral, but happen to have a better impact in terms of integration. Justice Sotomayor, I would disagree that it's completely race-neutral, because at the outset, statistical disparities based on race, racial classifications are used. And this has the potential to subordinate traditional racial classifications. Scalia, which is not the case for the 10 percent plan that Texas uses, right? Absolutely, Justice Sotomayor. There's no racial thing in that? If you're in the top 10 percent of your high school class, you go to the state university. No race at all. What was the reason for it? And it's you can say it's a neutral, 10 percent is neutral, but it's just glaring in the face that the legislature that passed this was very much race conscious. It was the way that they saw of getting a minority population into colleges. I don't think there's really a doubt that factually that's what prompted the 10 percent plan when the University of Texas was told its affirmative action plan was no good, and then the legislature came back with the 10 percent plan. But there's a difference between that race conscious decision making and here in a situation where liability is triggered based on statistical disparities. That's why the Watson plurality, Justice Sotomayor. Liability is not triggered. Well, triggered is a good word, but it's not imposed because of that. It's imposed because the lower court found, rightly or wrongly, I don't want to get into the merits of that, that some of the criteria being used was unnecessary, and that was and there was no legitimate business reason for it. I could, as Justice Breyer said, quarrel with that conclusion, but that's an application. That's not in the standard that disparate impact imposes. But what objective standard is there to measure whether something is a substantial interest in the housing context? And that's why disparate impact liability can lead to the functional equivalent of a quota system. That's what the Watson plurality said. Ward's Cove and Justice Scalia's concurrence in reaching. Mr. Chief Justice, if I could reserve the remainder of my time for rebuttal. Roberts. Thank you, counsel. Mr. Daniel. Mr. Chief Justice, and may it please the Court. The remedy in this case is perfectly consistent with the interest in revitalizing low income minority areas. The remedy in this case shows that there is nothing about the Fair Housing Act that is particularly consistent. We're not talking about this case. I'm just using the name. Sotomayor, why don't you get to the legal issue, if you could. The legal issue is unavailable. Unavailable is a result-oriented measure. You looked and see how many units are available in an area, you count them. That is the result. How many units are available in another area, you count them. That's the result. It's clear from the congressional record, Congress was worried and concerned about making units only available in low income minority areas that it called ghettos. The remedy that it wanted. It isn't the unavailable word that's the problem. The problem is unavailable on the basis of race. You can say unavailable a million times, but the statute requires that it be made unavailable for racial reasons. And you're saying, no, it doesn't have to be. It could be unavailable simply because you use some other nonracial reason, which is stupid. Right? That's your argument. If it produces a result that is not what? I don't know, that the races have to be in the same proportion as they are in the general population. Right? I mean, that's what your argument is. The argument is that if, in fact, racial discrimination is a foreseeable consequence of what someone is doing, then that's the problem. No, no, no, racial disparity is not racial discrimination. The fact that the NFL is largely black players is not discrimination. Discrimination requires intentionally excluding people of a certain race. It's really inclusive. Let's not equate racial disparity with discrimination. The two are quite different. And what you're arguing here is that racial disparity is enough to make whatever the policy adopted unlawful. Right? No, Justice Scalia, that's not what the argument is, and that's not what's in the argument. It's not what's in the regulations. The argument is, is that if I'm going to make a disparate treatment case, that there is intentional discrimination, I'm going to start with the effects. Just the same place I start with a disparate impact, I start with the effects. Has there been an effect that is consistent with discrimination? In disparate impact, I then go on to the next step. Is there an interest that justifies the discriminatory effect? It could be the same discriminatory effect that is caused by intentional discrimination. Mr. Daniel, I had thought that Justice Scalia's question was whether the because of language precludes a disparate impact theory. In other words, whether the because of language signals that it has to have a certain kind of intent which is not part of a disparate treatment, a disparate impact theory. And I would have thought that your main argument about that is, well, actually, the Court has held numerous times in the Title VII context, in the ADEA context, in the Rehabilitation Act context, in the Emergency School Aid Act context, that that because of language can be read to include disparate impact claims, and that it's at least ambiguous as to whether it should be read so in this case as to this particular statute. I mean, is that your argument or is there already something else? That is the basic argument because of that it has been interpreted both ways. And in the Title VII and in Smith, it did not require proof of intent. In this case, I'm sorry. If you want to, you can complete your answer, Justice Kagan. It was not a hard question. How is a housing authority supposed to, if you have a claim of disparate impact, how is a housing authority supposed to cure the alleged problem? Assuming that you go through the steps and that there is, in fact, a need to cure the problem. Could you, well, you find, I'm sorry, I'm sorry, you have made a showing of disparate impact, that the impact has adverse consequences for a particular race. What is the housing authority supposed to do at that point? That point, the housing authority is to say this is what interest we have that is served by the discriminatory practice causing the racial segregation. That's what they say, whatever that interest is, and they say it, that this is, this interest justifies our practice, our, that we're doing. At that point in time, we come back and say, but there are other ways to do it that are less discriminatory. And then there is a way to avoid a disparate impact consequence without taking race into account in carrying out the governmental activity? It seems to me that if the objection is that there aren't a sufficient number of minorities in a particular project, you have to look at the race until you get whatever you regard as the right target. You don't have to look at the race at all. You look at the practice causing it, and you stop the practice, like in this case or like in his own case. Ginsburg, But what was, in fact, the remedy? I mean, this is a case where there was a litigation, you prevailed, and there was a remedy. So there was disparate impact, and what did the Court say had to be done to cure what it saw as the offense to the fair? It had to stop the discriminatory housing practice, and then it had to, then it ordered in place the remedy suggested by the State that was, in fact, the less discriminatory alternatives, for a large extent, to what they had been doing. There's no racial goals in it. There's no race conscience in it. There's no racial criteria in it. It is a, there is, and it is the remedy that the State says will work to stop the discriminatory practice. Could we go back, I think you've been interrupted. The steps are, first you show there's a, that the numbers are off. Then the other side tells you what the reason is for why the numbers are. You then have an opportunity or an obligation to come and suggest alternative methods of taking care of the legitimate business need, correct? Yes, Justice Sotomayor. So you, those are the three steps. Yes. If you can propose ways that are race neutral, practices that are race neutral, that will have, take care of their needs, meaning the other side's needs, then you get relief. And, for example, one of the ways proposed was do not continue putting projects next to landfills and hazardous industrial uses. That was just the building. Don't you have a tension between two statutes here? I mean, you have the Fair Housing Act. And then there is the law that sets up this tax credit, right? And doesn't that law say that there should be a priority for revitalizing decaying communities? The law specifically says that there should be a preference among all the projects that are going to be awarded for applications that contribute to a concerted community revitalization plan. That preference is honored in the remedy, and it is in the remedy. If you are, if an application is concerting, is contributing to a concerted community revitalization plan, just like in the IRS Code, then it gets the same points as a project that is going to be in a higher income, low poverty area with good schools. Why shouldn't it get more if the tax law expresses that preference for the revitalization? Justice Ginsburg, it could if the State set it up that way. The State just hasn't set it up that way. The State could set it up so that there is a pool of units that are going to be awarded projects and pick out of there and give preference to those concerted community revitalization plans. The district court found that the State did not do that. The State instead gave a two-point, one or two-point selection criteria bonus for that kind of project. That's, that's, but that's a State choice. Breyer. Breyer. Can you go back to Justice Scalia's question, please, because I just want to hear your answer to it. As I understood his question, it was you look at the words and the words say, make unavailable because of race. And what you are saying is those words, make unavailable because of race, can include the circumstance where you make unavailable for a reason that has nothing to do with race, where the effect of that reason is to cause a racial disparity of significance and it cannot be justified as the least restrictive way to bring about it. That's the point. That you are saying those words are consistent with the longer phrase I just said. Okay. Is there case law or other, aside from this area, which builds your point and says, yes, those words linguistically and legally do include the disparate impact situation or can? I take it that's his question and I was looking for an answer somewhat along those lines from the other answer. This Court's two major opinions on this are, of course, Griggs and Smith. The same issue was wrestled with, with the other courts who have found the same thing in the courts of appeals. Wrestling with this because of, and it is at least admits that it is a, a, it can't be, it's a permissible reading either way. Alito, in Smith, however, the court, the plurality opinion, cited two additional things. It didn't just say because of can mean disparate impact. It cited the effects language, which was the subject of some questioning during General Keller's argument, but it also cited the RFOA provision. Now, none, neither of those, I think the latter is more significant, and there's nothing like that in Title VIII, is there? The exemptions are, are similar in the fact that what those, they do, the RFOA in Smith came in and basically said even if you have disparate impact on these factors, if it's a reasonable factor other than age, we're going to excuse the disparate impact. Now, the exemptions speak to the disparate impact, and there's no, nothing in there that says that there's, that you can excuse that those don't count. Alito, is that critical to your argument, that the exemptions are critical to your argument? We think the exemptions are text that support the use of a disparate impact reliability. We think there's a lot of other things. The statutory construction used, the congressional record, what Congress wanted to do, 3601, which Congress passed to say and has been used to give an expansive interpretation in matters of standing and enforcement. We think those, all those tools of statutory construction combine to make it at least permissible, and therefore giving due deference to the HUD regulation. If there was no disparate impact under the Act as initially enacted, do you argue that the exemptions expanded the Act so that it then, as of 1988, included disparate impact? Well, if there was none then, there indicated that in 1988 Congress thought there was. We don't think you can look at what Congress did in 1968 and say they did not intend to cover effects. They say it time and time again. Well, that wasn't really my question. What Congress thought the Act meant in 1988 wouldn't have any significant – wouldn't have much significance if they hadn't done anything, would it? I think they were doing it in 1988. That counts for 1988. We think it had been done before. So did what they – did the things that they actually did in 1988 expand the coverage of the Act? No, just we think that the coverage was already there in the 1968 Act. When you look at all the tools of statutory construction, they all point in one direction, and that is to being at least a permissible, if not the best, interpretation in 1968 that Congress intended to cover effects of past segregation and other discrimination, whether it was intentional or not. It's throughout that record. It is discussing the major implement of racial segregation, how it was brought about. It intended to end the effects of that. It said it again and again. We think that in 1988 it certainly recognized the disparate impact rule. It talked about the disparate impact rule in the courts of appeals. It knew it was there. It was being done in the context of those courts of appeals. No further questions? Thank you, counsel. Mr. Chief Justice, and may it please the Court, the statutory provisions that most clearly show that HUD's disparate impact regulations are a permissible interpretation of the Fair Housing Act are the three exemptions. Those exemptions presuppose the existence of disparate impact liability and serve no real purpose without them, without disparate impact liability. And the provenance of those exemptions lends particularly strong support for the reasonableness of HUD's reading. They were added by amendment in 1988 at a time when nine, I think the number is nine, courts of appeals had ruled that the Fair Housing Act authorized disparate impact. And they were added to provide defenses to exemptions from, they're labeled as exemptions from, carve-outs from disparate impact liability. So you've got two. Scalia, I think your case would be stronger if there had been no court of appeals that had favored disparate impact. Then you couldn't possibly argue, well, that was put in just to eliminate the erroneous judgments of these courts of appeals in certain areas anyway. It would be better if no court of appeals had said that. Congress had enacted these things. Verrilli, I actually think it's better the way it happened for our case because of the reenactment canon. You have, I mean, section 805 of this law was reenacted against the backdrop. So you have the reenactment of those nine court of appeals. So you have the reenactment canon and you have the canon against the presumption against superfluous amendments, both working. And remember, we're in Chevron territory here. So the question is whether the statutory text unambiguously forecloses HUD's interpretation. Roberts, I want to ask you a question about that. Roberts, one concern about disparate impact is that it's very difficult to decide what impact is good and bad. Take two proposals. One is a proposal to build new housing in a low-income area with benefit primarily minorities. New housing, good thing. The other proposal is to build housing in a more affluent area. Would help promote integration of housing, also a good thing. Which one gets credit for under trying to decide the impact? The one that is revitalizing a low-income area or the one that is integrating a high-income area? Verrilli, I understand that, Mr. Chief Justice, and there may be difficult questions. Of course, the agency here charged by Congress expressly in the 1988 amendments, I would add, with interpreting and enforcing these provisions, has concluded that they do, that disparate impact is the right policy judgment. Roberts, which counts? I mean, which benefits? You're trying to see if there's a disparate impact on minorities. Verrilli, if you give the proposal to the low-income housing in the affluent neighborhood, that certainly benefits integration. If you give the proposal, fund the proposal in the low-income area, that certainly helps housing opportunities there. So I'm going to answer Your Honor's question directly, but I think you've got to do it in the context of the way in which a disparate impact case has got to be proven. It's not enough just that there's a statistical disparity. A plaintiff has got to demonstrate that a particular practice or criterion being applied. And what is the practice here? Because that was the question Judge Jones. Well, you know, that's a very good question. If I may just answer, Justice Ginsburg, and then I'll come back and finish my answer to you, Mr. Chief Justice. That the — that's a very good point, Justice Ginsburg. And we are — you know, although we are here defending HUD's interpretation and we think the answer to the question presented is yes, that that's — we don't have a position on whether this is a viable disparate impact claim. And we think Judge Jones has made a good point in our — in her concurrence because it's not clear to us what specific practice that the State agency has engaged in here that would — would justify the finding of disparate impact liability. And one thing that was suggested is maybe that could be dealt with on remand from the district court. And I do think that's — and that gets to what I was trying to say to you, Mr. Chief Justice, which is that you've got to apply the test, which is HUD is set out as a rigorous test. Roberts With respect, I don't think that's responsive. You say you look at which provision is having a disparate impact, but I still don't understand which is the disparate impact. In other words, is it the provision that causes more proposals to go to low-income housing in the affluent area, or is it the provision that causes more approval of more proposals in the low-income area? You've got to know what you're shooting at before you can tell if you've missed. Verrilli, Jr. Well, the disparate — the disparity tied to a particular practice is just the first step in the analysis. The second step in the analysis is justification. What's the justification? Roberts I'm sorry. And I'll just ask for the last time and then let you get on. You're saying you need a justification, but for what? Which is the bad thing to do, not promote better housing in the low-income area or not promote housing integration? You say you look at what's causing the bad effect, but what's the bad effect? Verrilli, Jr. It may be that neither is, because the State may say, the government may say in the first case, well, this is our justification and that may be a justification that holds up. The government may say in the second case, well, that's our justification and that may be a justification that holds up. So I just think that's part of the question. Sotomayor Do you think that a private developer would ever be found guilty of disparate impact because he owns a piece of property in an affluent neighborhood? Verrilli, Jr. No, certainly not. Sotomayor He's permitted to develop his property, right? Verrilli, Jr. Yes, of course. Sotomayor The disparate impact would be if he fails to sell or make available to people of all races, let's say, the units in that property, correct? Verrilli, Jr. There's got to be a specific practice. Sotomayor Practice, all right. Verrilli, Jr.  Sotomayor A specific practice that has a business. Verrilli, Jr. That's just the first state analysis. It's got to be unjustified. Sotomayor Exactly. Verrilli, Jr. I thought the question was, though, I mean, it's not a developer. It's the Department of Housing and Community Affairs. And I thought the challenge went to where they were supporting development. Verrilli, Jr. Well, this may be the developer, but this may not be a good disparate impact. I claim, Mr. Chief Justice, but the cases that are in the heartland are really pretty straightforward. Kennedy But are you saying that in each case that the Chief Justice puts, there is initially a disparate impact at step one? That is to say, community A wants the development to be in the suburbs. In the next state, the community wants it to be in the poorer neighborhoods. It's your position, it seems to me, the position of the Respondents, that in either case, step one has been satisfied. Verrilli, Jr. That may be right, Justice Kennedy, but I think the point that that seems very odd to me. But I think that even if there are difficult cases on a disparate impact, there are cases in the heartland that have been adjudicated for 35 or 40 years, cases such as there's a zoning restriction that has a disparate impact that cannot be justified on a substantial basis. There's an occupancy restriction for an apartment building. Alito Can I ask a question? I'm sorry. About Chevron. Shouldn't you be concerned here about the use of Chevron to manipulate the decisions of this Court? The Fair Housing Act was enacted in 1968. For 40 years plus, there were no HUD regulations. Then we granted cert in the Gallagher case, and it was only after that, and within, I think, days after that, that the HUD regulations were issued. And then the Gallagher case settled, and then we issued the Mount Holly case, and the Mount Holly case settled. So should we be troubled by this chronology? Verrilli, Jr. So I understand the import of your question, Your Honor. I guess I would say a couple of things in response. The first is that HUD, in formal adjudications reviewed by the Secretary, has found disparate impact liability available under these provisions in the Fair Housing Act since 1992, I believe, and those would be entitled to Chevron deference. And I do think, respectfully, that that's a point that we made in our brief in the first case, the Gallagher case. Second, and I don't mean to be flip about it, because I understand the import of Your Honor's question, but I do think it overestimates the efficiency of the government to think that we could get a notice of proposed rulemaking on an issue like this out within 7 days. Scalia It was a coincidence. That's very persuasive. Very persuasive. Verrilli, Jr. I really don't. So I think actually this has been the position of HUD for a very long time, and you would get Chevron deference for the adjudications. I think that's pretty clear, wholly apart from the reg. But we do have the reg now, and I do think it gets Chevron deference. If I could turn to the question of avoidance, constitutional avoidance that has come up, I don't think this is a suitable case for constitutional avoidance, and let me try to explain why. Whatever one might think in the Title VII context about the consequences of finding disparate impact liability, this is a very different context. In the Title VII context, the issue that's been raised is that the only way to avoid disparate impact liability is to engage in race-based remedies, not race-based thinking about what neutral criterion to adopt, but race-based remedies. And here, in the Heartland cases under the Fair Housing Act, you aren't going to have that kind of an issue. The remedy is going to be the substitution of one race-neutral rule for another race-neutral rule. For example, if a landlord cannot justify an occupancy restriction that's particularly tight, the remedy there is going to be either no occupancy restriction or a looser occupancy restriction, and the consequence in those cases, same thing with zoning and other things, the consequence in those cases is that no one gets classified by race, no one gets a burden imposed upon them because of race, and no one gets a benefit because of race. Scalia, the rule you select depends on what effect that will have on racial use of the facility. Well, I think the consequence, no, I think, Justice Scalia, you select this on the basis of what effect it will have on race. Well, but that kind of consideration, so long as the rule that comes later is a race-neutral rule, seems to me is exactly the kind of thing that the plurality opinion of this to minority contractors, but they could do such things, the Court suggested, as changing the bonding requirements or changing other financial requirements in order to make the minority contractors, which tended to be newer, smaller businesses, more eligible. Sotomayor To underscore that, because I think everybody's getting confused with this, disparate impact does not go to who they take unless they set up a practice. That has that effect. In the Heartland cases, with respect to the Fair Housing Act, the kinds of remedies that are going to be imposed are like the kinds of remedies that the Court said, or the plurality, excuse me, said in Croson were fine, and, Justice Kennedy, they're like the kinds of race-neutral considerations that Your Honor's opinion in Parenson did. Breyer, what you're saying is, suppose that the plaintiffs in this case, that side, wins, to try, they're trying to win. The defense on the, it's not true that that means all Section 8 housing is now going to be, or even a large amount, is going to be put in rich neighborhoods. First, they can defend on the ground that we don't have that practice, to put it in poor neighborhoods. Second, they could say, yes, we do, but don't you see that isn't going to hurt minorities, because it puts those minorities in housing where many of them are, unfortunately, in poor neighborhoods, and it doesn't have the great effect on desegregation that they think. Or third, if they lose on that, they can say, but anyway, it's justified, for a whole bunch of reasons. So the answer is, case by case, they have a specific set of forms that give answers, and judges judge it. And HUD can come in and decide. And there is no need to throw the whole baby out, or I don't know whether it's the baby with the bathwater or whatever you're throwing out, but you don't have to throw out the whole big thing in order to prevent. Roberts So, just as I can understand, because, again, I don't know what you're shooting for, two different communities, okay, they have these tax credits, whatever, to give out. One place they give it to the housing in the affluent neighborhood, the other they give it to the housing in the low-income neighborhood. They're both sued for disparate impact. In the one they say, oh, no, no, this is good because we're promoting integration, so the impact on the minorities is not a problem. And the other says, no, this is good because we're revitalizing low-income neighborhoods and that helps the minorities. They both win? Verrilli, They might both win, yes. And if I could just — I just want to finish up on the constitutional avoidance point, if I could connect that to something Justice Breyer said. If there are particular instances in which there is a concern that the recognition of disparate impact liability could result in not just race-based thinking about neutral means, but race-based remedies, it seems to me the answer there is the answer that the Court usually gives, which is think about them on an as-applied basis. But that isn't a justification for denying HUD the authority that we submit that HUD has under the regulations, under the statute as amended in 1988, when Congress specifically gave HUD the authority to interpret these provisions and did so against the backdrop of imposing the exemptions which presuppose disparate impact liability and reenacting a statute in which after nine courts of appeals had found that it did impose disparate impact liability. The question here is whether under Chevron, the statutory text read fairly in 1988, taking all provisions of the statute together, unambiguously forecloses HUD from finding disparate impact liability here. And we assume, we submit that the answer to that question must be no, it does not foreclose HUD from reaching the conclusion it reached, and therefore, the answer to the question presented in this case, which is whether the Fair Housing Act recognizes disparate impact liability, is yes. Kagan. Kagan. And, General, could I just ask, I don't know a lot about this area, and I take it that one of the things that you are warning us against is seeing the entire area through the prism of this one quite unusual case, and you've referred a few times to sort of the Heartland cases, but without really getting out what the Heartland cases are. So for me, what are they? Verrilli, may I answer, Mr. Chief Justice? Thank you. The kinds of cases that have been litigated, and you've seen the courts of opinion of court of appeals opinions for 35 years, restrictions say a town adopts a restriction saying you can't convert housing from ownership to rental unless you're renting to a blood relative, has the effect of excluding minorities. A town adopts an occupancy restriction for apartment buildings that's so tight that you're not going to be able to, that families with kids aren't going to be able to live there. That disproportionately affects minority groups with kids. Those kinds of things, zoning restrictions, housing program restrictions, those kinds of rules are the Heartland cases. Thank you. Thank you, General. General Keller, you have 4 minutes remaining. Mr. Chief Justice, the answer to your question is both would open up liability for disparate impact. Here, the Department could have faced disparate impact liability if it was going to take tax credits and send them to lower income neighborhoods or more affluent neighborhoods. And even if there's not what happens here, the remedy was not to tell you to move your development from one area to another. The remedy here was it did preclude development next to landfills, but it also included other tinkering with the qualifications. But you're going to still need people who want to do the development they want to do. But in the remedy in this case, the district court kept it and retained jurisdiction for 5 years. So even if the disparity is not close, we're still going to have to do it. That has to go with your attacks on the remedy. That doesn't have anything to do with what disparate impact as an approach set out by HUD direct should be done. And each regulated entity is going to have to examine the racial outcomes of their policies in every zoning decision made, in every raising of rent. No. What they have to do is what everyone should do, is before they set up any policies, think about what is the most race-neutral policy. That's a very different thing that I think everyone is obligated to do. And that's precisely what the Department of Justice does. It's only if the other side proves that a qualification has a race effect that's not necessary can they win. And here the Department engaged in race-neutral policies. Justice Alito, to your point about Smith and the ADA's reasonable factors other than age exemption, there are three things that distinguish that from this case. First, there's an important textual difference. The ADA's reasonable factor other than age provision referred to actions otherwise prohibited, and the Court in Smith interpreted that as recognizing the disparate impact liability could lie under the ADA. In the Fair Housing Act, we don't have that language. The exemptions say nothing in the FHA prohibits or limits. So this is truly a safe harbor. Second, Smith already noted that the ADA used adversely effect. And third, Smith didn't involve race, and so no constitutional avoidance can and would have applied there. And on constitutional avoidance, the reason we're here today is because the Texas Department did not use race-based decision-making. Take a hypothetical from Grutter. If the University of Michigan had said the incoming class must have 30 percent of its incoming class of a certain race, and we prefer that race-conscious or race-neutral means were used to do that. But if those aren't available, race-based means must be used, that would be suspect at the very least. All we need to show is a constitutional doubt for the constitutional avoidance can and would apply here. And Ricci said that there was one. Sotomayor What in the remedy ordered here was race-based? What remedy said you have to take in 10, 20, 15 percent? Clement The particular remedy here wasn't race-based, but the liability to begin with, and whether the disparity is going to close and whether the department is going to remain not in compliance with the Fair Housing Act, is still race-based. Thank you, Mr. Chief Justice. Roberts Thank you, counsel. The case is submitted.